## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br> Plaintiff, <br><br><br> v. <br><br><br> **YADIEL OMAR DE JESUS DE JESUS**, <br> Defendant. | CRIM. NO. 22-536 (FAB-MDM) |

## REPORT AND RECOMMENDATION

### I.  Introduction and Procedural History

The defendant, Yadiel Omar De Jesús De Jesús (the "defendant"), stands charged in a two-count indictment with aiding and abetting in the possession and brandishing of a firearm in furtherance of a crime of violence, in violation of Title 18, *United States Code*, Sections 924(c)(1)(A)(ii) and 2 (Count One), and aiding and abetting a carjacking, in violation of Title 18, *United States Code*, Sections 2119(1) and 2 (Count Two). *See* Docket No. 1.

Pending before the Court is the defendant's motion to suppress the warrantless seizure of 1) a firearm and ammunition found inside a vehicle, a Hyundai Accent (the "Hyundai Accent"), wherein the defendant was a passenger, and 2) a car key and a Samsung cellphone found on the defendant's person. The defendant also sought suppression of incriminating post-arrest statements he made to law enforcement claiming that such statements were the result of the prior illegal search of the Hyundai Accent and his person and should therefore be suppressed pursuant to the fruit of the poisonous tree doctrine (the "Motion to Suppress"). *See* Docket No. 25.

The government filed an opposition to the Motion to Suppress (the "Opposition") wherein it argued first, that the defendant lacks standing to challenge the search and seizure of the firearm and ammunition from the Hyundai Accent because, being a mere passenger, he cannot show that he enjoyed a

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 2 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                     Page 2
Crim. No. 22-536 (FAB)

reasonable expectation of privacy in the vehicle, and second, that the search of the Hyundai Accent began with a legal *Terry* stop[1] based on the reasonable articulable suspicion that the Hyundai Accent was connected to a Hyundai Sonata (the "Hyundai Sonata") parked only a couple feet away, that had been used to commit a carjacking some three days prior in Humacao, Puerto Rico. *See* Docket No. 30. The government further claimed that when the heavily-tinted-Hyundai Accent moved forward a few feet and the occupants opened the car doors, the officers' suspicions ripened to probable cause after spotting a firearm in plain view on the passenger-side floor of the Hyundai Accent. The government also argued that the resulting arrest of the defendant and the driver of the Hyundai Accent for the commission of a felony in the presence of law enforcement officers validated the later post-*Miranda* interview of the defendant, which resulted in his making the incriminating statements that are now being challenged as well.

The defendant filed a reply to the government's Opposition (the "Reply"). *See* Docket No. 37.

On April 1, 2024, the Court celebrated the first day of a two-day evidentiary hearing during which it heard testimony from Puerto Rico Police Bureau ("PRPB") Officer Iliana Cruz-Velázquez ("Officer Cruz") and PRPB Officer Victor Osorio-Guzmán ("Officer Osorio"). The government admitted into evidence five (5) exhibits together with relevant markups, and then rested its case. The defendant presented the testimony of PRPB Officer Luis F. Zayas-Flores ("Officer Zayas"). The evidentiary hearing was continued on April 24, 2024, when the defense recalled Officer Osorio to the stand. The defense introduced two (2) exhibits together with relevant markups before resting its case.[2]

The government recalled Officer Osorio as a rebuttal witness to discuss matters related to best police practices when calling in license plate numbers during

---

[1] *Terry* stops are legal interventions for investigation purposes based on the seminal case of *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

[2] The defendant did not testify, nor did he provide a sworn statement in support of any of his allegations.

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 3 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                        Page 3
Crim. No. 22-536 (FAB)

an investigation. After hearing the testimony, the Court struck Officer Osorio's rebuttal testimony from the record as irrelevant.

The Court ordered the parties to file post-hearing briefs, which the government did on May 17, 2024. S*ee* Docket No. 60. The defendant filed a response on July 12, 2024. S*ee* Docket No. 64. No reply was filed.

After listening to the testimony presented, evaluating the exhibits, and making the necessary credibility assessments, upon careful consideration of the arguments raised by the parties, and based on the following factual findings and legal analysis, the undersigned recommends that the Motion to Suppress be **DENIED**.

## II. The Court's Findings of Fact

### A. *The October 21, 2022 Carjacking*

A carjacking was reported to have taken place on October 21, 2022, at approximately 12:02AM, at the Total Gas Station located in the Pitaya Ward of Humacao, Puerto Rico. *See* Docket No. 50[3] at 41-42. The male victim of the carjacking recounted to law enforcement that several individuals wearing masks and carrying long weapons (*id.* at 96) stole his gray Toyota Corolla. *Id.* at 42. The carjacking was captured on video from a security camera at the gas station.[4] *Id.* As part of the investigation, Officer Osorio, then a 23-year veteran of the PRPB (*id.* at 39), received a screen shot from the security camera video that showed a light gray Hyundai Sonata, bearing license plate number HQC-995, that was suspected of having been used by the perpetrators to commit the carjacking. *Id.* at 42-44. *See also* Govt. Exhibit No. 2. Officer Osorio, the Director of the CIC[5] Humacao, REPAPD Division, which stands for Investigations of Robberies, Assaults, Missing Persons, and Fraud (*see* Docket 59 at 64), assigned Officer Zayas to lead the investigation into the carjacking. *Id.* at 41.

---

[3] Docket No. 50 is the transcript from the first day of the evidentiary hearing. Docket No. 59 is the transcript from the second day of the evidentiary hearing.

[4] Though there was a video of the carjacking, neither Officer Osorio nor Officer Zayas reviewed the video prior to the October 24, 2022 intervention with the defendant.

[5] "CIC" stands for "Cuerpo de Investigaciones Criminales" in its original Spanish or "Criminal Investigations Corps" in English.

B. *The October 24, 2022 Intervention with the Defendant*

On October 24, 2022, at approximately 3:45PM, on a clear sunny day in the town of San Lorenzo, Puerto Rico,[6] Officer Osorio and Officer Zayas were driving down Road 9929 assisting the PRPB Homicide Division in an attempt to serve a summons on a person of interest in an unrelated homicide investigation. *Id.* at 45, 52. Officer Zayas was driving an official, unmarked, black Toyota Corolla (the "unmarked Toyota Corolla") and Officer Osorio was seated in the passenger seat. *Id.* They were both dressed in plain clothes, were armed, and had their police credentials visible. *Id.* at 45-46.

As they drove by a subdivision named "Ciudad Masso" on their left-hand side, there was a large vacant lot to their right where two light gray vehicles were parked right next to each other. Officer Zayas commented to Officer Osorio that one of the vehicles looked similar to the Hyundai Sonata that was suspected of having been used to commit the carjacking three days earlier in Humacao that he was charged with investigating. *Id.*

Because the two cars were parked facing Road 9929, their license plates were not visible to the officers as they drove by. Officer Osorio and Officer Zayas therefore decided to turn their vehicle around and enter the lot to investigate further. *Id.* at 54. After turning into the lot, Officer Zayas pulled the unmarked Toyota Corolla behind the two gray cars and parked at a slight angle perpendicular to them. The two gray cars were parked parallel to one another off to the right side of the unmarked Toyota Corolla. The Hyundai Sonata was parked just to the right of the Hyundai Accent. *Id.* at 55, 99. *See also* Govt. Exhibits 4 and 4(a). The two gray cars were parked approximately two feet from each other. Docket 50 at 58.

Officer Zayas parked the unmarked Toyota Corolla close enough to the back of the Hyundai Sonata to discern that the original license plate number, "HQC-995," had been altered with a piece of black tape with the apparent purpose of making the "C" look like an "O." *Id.* at 56. At a distance, therefore, the license plate was made to

---

[6] Officer Osorio testified that San Lorenzo is approximately a 29-minute drive from where the carjacking took place in Humacao, PR.

look like "HQ<u>O</u>-995," instead of "HQ<u>C</u>-995." (Emphasis added). In light of this alteration to the license plate, Officer Zayas realized immediately that the Sonata was the car suspected of having been used in the carjacking in Humacao because he had memorized the correct license plate number as part of his investigation. *Id.* at 101. For that reason, Officer Zayas said he did not feel the need to run the Hyundai Sonata's license plate number at that moment. *Id.* Instead, he simply planned on calling for a tow truck to come pick up the car until a search warrant could be obtained. Docket No. 50 at 102 & 120.

As the officers exited the unmarked Toyota Corolla to begin processing the Sonata, however, they noticed the Hyundai Accent lurch forward a few feet and then stop. *Id.* This surprised both Officer Zayas and Officer Osorio because from inside their own vehicle they had not heard whether the motors of either the Sonata or the Accent were running. Nor were they able to see anyone inside of either vehicle due to the very dark tinting on the windows of both cars. *Id.* at 59. After seeing the Hyundai Accent move forward, however, they understood that there was a driver inside. Accordingly, given the fact that 1) the two gray cars were the only vehicles parked in the lot at the time, 2) the lot itself was unpaved and had no lines delineating parking spaces, 3) the cars appeared to have been parked intentionally close to one another, and 4) the Sonata was directly linked to the carjacking that had taken place three days prior in Humacao, Officer Zayas and Officer Osorio's suspicion was peaked. Therefore, they felt compelled to investigate the Hyundai Accent further. *Id.* at 60.

In so doing, the officers exited the unmarked police vehicle with their weapons drawn and walked towards the Hyundai Accent. *Id.* at 104. Officer Osorio walked towards the passenger's side of the vehicle and Officer Zayas walked towards the driver's side. *Id.* at 61. When Officer Zayas reached the area next to driver's side door, he was surprised when the driver of the Hyundai Accent opened the door and said something to the effect of, "Colleague, tell me what happened."[7]

---

[7] On cross examination, defense counsel offered an alternative translation for what the driver said, namely "Everything okay, colleague?" *Id.* at 73.

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 6 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                    Page 6
Crim. No. 22-536 (FAB)

*Id.* at 105. Finding it strange for the driver of the car to address him using the word "colleague," Officer Zayas asked him, "How come colleague." *Id.* at 105.[8] Whereupon, the driver, later identified as Iancarlo Marín Algarín, said he worked as a security guard and that he possessed a firearms license. *Id.*

Nearly simultaneous with the driver of the Hyundai Accent opening his door and referring to Officer Zayas as "colleague," the passenger-side door opened as well. *Id.* at 61. Officer Osorio saw an individual, later identified as the defendant, sitting in the passenger's seat. Standing only a couple feet away from the open door, Officer Osorio could see between the legs of the defendant a gray and black pistol with a long magazine on the passenger's-side floor. The magazine was transparent and had a capacity to hold 40 bullets.[9] The testimony also showed that when seen on the floor of the Hyundai Accent, the magazine contained an undetermined number of "golden color" bullets. The weapon was facing forward with the magazine pointing to the right towards the passenger's-side door. *Id.* 62. Officer Osorio immediately asked the defendant if he had a permit to carry the weapon, to wit he said, "No." *Id.* at 64. From Officer Osorio's vantage point near the passenger's-side door, he could also see that the driver had a khaki-colored firearm on the right side of his waist. *Id.* at 64.

Thereupon, Officer Osorio instructed Officer Zayas to place both individuals under arrest. *Id.* Officer Osorio took charge of handcuffing the defendant, placing him under arrest, and reading him his *Miranda* rights. *Id.* In a search incident to arrest, Officer Osorio found on the defendant's person a car key and a Samsung cellphone. *Id.* at 64. Later, it was discovered that the car key found on the defendant's person belonged to the Hyundai Sonata parked a couple feet away that

---

[8] Officer Zayas explained during the evidentiary hearing that he believed that the driver's use of the term "colleague" meant that he knew that he and Officer Osorio were in fact police officers. *Id.* at 73.

[9] Of course, Officer Osorio did not know when he first saw the firearm on the floor of the vehicle that the magazine had a capacity to hold 40 bullets. That information was gleaned after placing the defendant under arrest and inspecting the weapon closeup. It is nevertheless important to mention here as it better describes just how long that extended magazine was and how reasonable it would have been for an officer to notice such a weapon under the circumstances described herein.

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 7 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                           Page 7
Crim. No. 22-536 (FAB)

was believed to have been used to commit the carjacking on October 21, 2022. *Id.*
at 65.

Once the scene was secure and the individuals were placed under arrest,
Officer Osorio took out his personal cellphone and snapped a photo of the two cars
as they were parked during the intervention.[10] *Id.* at 56. *See* also Govt. Exhibit 4.
The photo Officer Osorio took shows the license plate of the Hyundai Sonata altered
by the black tape. *Id.* The Hyundai Sontata was then sealed up by Officer Zayas and
transported by tow truck to the Humacao Regional Police Precinct. *Id.* at 120.

Later that evening, the defendant was interviewed by Officer Zayas at the
Humacao Police Headquarters. *Id.* at 66. After Officer Zayas completed his
interview of the defendant, Officer Cruz was called in to join them in the interview
room to personally witness the defendant handwrite two confessions; the first one
having to do with his role in the carjacking that occurred on October 21, 2022,[11] and
the second one having to do with the police intervention on October 24, 2022
involving the seized firearm and ammunition (the "second confession"). *See* Govt.
Exhibit 1. When asked if the defendant had been duly explained his *Miranda* rights
before being interviewed by Officer Zayas, Officer Cruz testified that the defendant
was advised of his *Miranda* rights both orally and in writing. *Id.* at 17.

The defendant's second confession was documented on PRPB Form
PPR-615.9 (the "Form"), entitled "Suspect's Statement." *See* Govt. Exhibit 1.
The Form indicates that the defendant began drafting the statement at 8:40PM on
October 24, 2022 and concluded eight minutes later at 8:48PM. Both Officer Zayas
and Officer Cruz signed the Form as witnesses. The text of defendant's second
confession reads verbatim as follows:

> I am Yadiel De Jesus and when the officers arrived, they
> got out and we opened the car door with our hands up.

---

[10] Though there was no testimony stating exactly when the photo was taken by Officer
Osorio, because there appears to be an agent standing in front of the Hyundai Accent and the
vehicle's trunk is open, the Court finds that it must have been taken after placing the individuals
under arrest.

[11] This first confession dealing with the carjacking was not introduced into evidence during
the evidentiary hearing.

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 8 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                      Page 8
Crim. No. 22-536 (FAB)

> Ian told the police officer that he had a permit to carry a
> firearm. The police officer took from me a black and grey
> gun with a long clear magazine from the floor of the car.
> That gun I have had it for about six months. I bought it
> on the streets for $1,500.

At the bottom of the Form, under the words "Signature of the Person in Custody," the signature of the defendant appears. *See* Govt. Exhibit 1.

## III.    Discussion

### A. The defendant failed to meet his burden to demonstrate that he has standing to challenge the search and seizure of the firearm and ammunition found inside the Hyundai Accent wherein he was a mere passenger.

Before delving into the issues raised by the defendant in support of his grounds for seeking suppression of the evidence in this case, the government submits that the defendant failed to meet his burden to demonstrate that he has standing to challenge the search and seizure of the firearm and the ammunition that was found inside the Hyundai Accent wherein he was a mere passenger. For the reasons that follow, the Court agrees.

To start, the Fourth Amendment's protection against unreasonable searches and seizures extends only to those places and interests in which the defendant has a reasonable expectation of privacy. *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir. 1994) (citing *United States v. Cruz Jiménez,* 894 F.2d 1, 5 (1st Cir. 1990) (citing *Rakas v. Illinois,* 439 U.S. 128, 140–50 (1978))). Such an expectation of privacy is a threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis. *Lewis*, at 1333 (citing *Cruz Jiménez,* 894 F.2d at 5 (citing *United States v. Salv*ucci, 448 U.S. 83, 90–91 (1980)). This burden, which rests squarely upon the defendant (*see Lewis* at 1333 (citing *Cruz Jiménez,* 894 F.2d at 5)), must be carried at the time of the pretrial hearing and on the record compiled at that hearing. *United States v. Aguirre*, 839 F.2d 854, 857 (1st Cir. 1988) (citing *United States v. Gómez*, 770 F.2d 251, 253 (1st Cir. 1985)).

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 9 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                    Page 9
Crim. No. 22-536 (FAB)

"What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile." *Lewis* at 1333 (quoting *Hoffa v. United States,* 385 U.S. 293, 301 (1966). "Essentially, . . . to prove a Fourth Amendment violation, [a defendant] must demonstrate not only that he exhibited a subjective expectation of privacy, but also that his expectation was justifiable under the attendant circumstances." *Lewis,* at 1333 (citing *Cruz Jiménez,* 894 F.2d at 5 (citing *Aguirre,* 839 F.2d at 857).

A defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects will not have standing to claim that they were illegally searched or seized. *United States v. Sánchez,* 943 F.2d 110, 113 (1st Cir. 1991); *see also United States v. Pierce,* 959 F.2d 1297, 1303 (5th Cir.), *cert. denied,* 506 U.S. 1007 (1992) (holding that a defendant lacked standing to object to a search because he never at any point during the trial or appeal "attempted to establish, much less prove, any privacy interest in the [contraband]"). In cases dealing with the search of a vehicle, for example, a defendant must demonstrate ownership, possession, or control of the vehicle as a preliminary step in establishing a reasonable expectation of privacy. A mere brief association with the vehicle, like being a mere passenger, is not sufficient to establish a reasonable expectation of privacy. *United States v. Payne*, 119 F.3d 637, 641-42 (8th Cir).

In this case, it is undisputed that the defendant failed to assert any privacy interest in the Hyundai Accent. He did not swear out an affidavit, he did not submit an unsworn statement under penalty of perjury, nor did he testify in support of any such expectation.[12] In fact, the unsworn statement submitted with the Motion to

---

[12] Indeed, during the first day of the evidentiary hearing, before any testimony was presented, counsel for the defendant all but conceded the narrow point that if the firearm and ammunition was, in fact, found inside the Hyundai Accent that the defendant would not have standing to challenge its seizure. More specifically, counsel for the defendant stated as follows,

Your Honor, let me make this just more simple or simpler. The government has contended that we don't have standing to suppress the firearm and the ammunition, in particular because my client was a passenger in the vehicle that was seized by the police

Suppress was subscribed to by the driver of the Hyundai Accent, Iancarlo Marin Algarin, and it all but sealed defendant's fate with respect to standing. Mr. Marín Algarin's unsworn statement confirmed that 1) the vehicle belonged to him, not the defendant, and 2) the defendant was a mere passenger. *See* Docket No. 25-1 at ¶¶ 1 & 2. These undisputed facts are conclusive of defendant's lack of standing.

Furthermore, though the defendant did not raise this issue in his Motion to Suppress, the Court notes that he does claim an apparent possessory interest in the firearm and the ammunition in his second confession. Such claim, however, does not alter the determination that he lacks standing to challenge the search of the vehicle. The defendant stated that, as of October 24, 2022, he had owned the firearm "for about six months," Docket Nos. 54-1 (the original Spanish version) & 47-1 (the English translation), and that he "bought it on the streets for $1,500." *Id.* This possessory claim does not create an expectation of privacy in defendant's favor because it is akin to the "bag-within-a-bag" situation discussed by the First Circuit in *United States v. Aguirre*, 839 F. 2d at 857.

In *Aguirre*, the defendant claimed that because a paper bag containing his personal effects, like his passport, letters, and photographs, was found inside a plastic bag that was, in turn, found inside an automobile, he reasonably had

---

officers during their intervention. I don't have any case law to dispute that aspect although I do have some discovery that was recently provided, which is another housekeeping matter that I want to bring up before we begin where there is an allegation that my client did claim ownership of the firearm that was seized.

Nevertheless, if it's the government's contention that since he was a passenger in the vehicle and the firearm was not found [o]n his person but in another area of the vehicle, that [he] would not have standing.

I'm not going to contest that at this hearing because that would simply be the case if it's demonstrated by the government that the firearm was not seized [o]n his person but was seized elsewhere in the vehicle[,] but nevertheless, I would still have standing if it's provided by the government that it was seized somewhere else in the vehicle and I would still have standing to contest his post arrest statements, the seizure of the cell phone and the car keys that were found in his person.

Docket No. 50 at 6-7.

standing to challenge the search and seizure of the paper bag, even if not the vehicle as a whole. The First Circuit found that such an argument "misperceives the prophylaxis which the fourth amendment affords." *Aguirre*, at 857. The Court noted that,

> [t]he most intimate of documents, if left strewn about the most public of places, would surely not be shielded. That the items seized were [Aguirre]'s personal effects was a mark in his favor—but without competent evidence to show that they were left in a place and under circumstances which could (and did) justifiably give rise to an expectation of privacy [for him specifically], the mark fell far short.

*Id.* at 857.

In this case, an argument in favor of standing to challenge the seizure of the firearm and ammunition based solely on defendant's claim of possessory interest over those items, without more, would suffer from the same malady as in *Aguirre*. The firearm and ammunition lying loose on the floor of the vehicle wherein the defendant was a mere passenger were not items over which the defendant attempted to establish a privacy interest. Indeed, quite the opposite is true. Having the firearm placed on the floor of the vehicle, either at the defendant's feet or even under his seat, is akin to, like the *Aguirre* Court has found, strewing his personal effects around the most public of places.[13] A firearm sitting on the floor of the vehicle in plain view of anyone inside or outside the vehicle does not demonstrate an intent to establish an expectation of privacy.[14]

---

[13] The Court does not find that the firearm was under the seat. Indeed, that would be inconsistent with the findings of fact set forth above. The Court only addresses this proposition to rebut defendant's argument in his Motion to Suppress and in his post-hearing brief that a normal person would have pushed the firearm under the seat if they had seen the police approaching the vehicle. The Court notes that even if the defendant had pushed the firearm under his seat, that would not have created an expectation of privacy or salvaged his standing argument.

[14] Factually speaking, having the firearm lying on the floor at the defendant's feet is consistent with the concept of having a firearm readily accessible for protection. And, when the officers parked their unmarked vehicle behind the two gray cars and did not immediately get out, the occupants of the Hyundai Accent could not have immediately discerned whether they were friend or foe.

In sum, the Court finds that the defendant has failed to meet his burden to demonstrate that he has standing to challenge the search and seizure of the firearm and ammunition found inside the Hyundai Accent wherein he was a mere passenger. Therefore, there is no legal basis to suppress these evidentiary items.

**B. The initial approach by the officers to the Hyundai Accent was supported by reasonable suspicion, which ripened into probable cause for arrest when the officers saw the firearm in plain view on the passenger-side floor.**

The parties agree that the defendant enjoyed an expectation of privacy over the items seized from his person incident to arrest. *See* Docket 60 at 1. They dispute, however, whether those items should be suppressed as fruit of the poisonous tree. Defendant argues that 1) he enjoyed an expectation of privacy over the items that were seized from his person, namely the key to the Hyundai Sonata and the Samsung cellphone, and 2) the items seized from his person should be suppressed because they qualify as fruit of the poisonous tree stemming from his illegal detention by police. He alleges further that the PRPB officers did not have reasonable articulable suspicion to detain him for investigation, nor did they have probable cause for his arrest.

1. *Reasonable articulable suspicion standard*

In the seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court recognized that some types of encounters between the police and citizens—such as brief detainments in the nature of a "stop and frisk"—could constitute "seizures" for Fourth Amendment purposes, yet be sufficiently limited in their intrusiveness to fall outside the traditional understanding of an "arrest." *United States v. Acosta*, 157 F.3d 9, 14 (1st Cir. 1998) (quoting *Dunaway v. New York*, 442 U.S. 200, 208–09 (1979)). The Court held that these limited types of seizures, by virtue of their low level of intrusiveness relative to the important law enforcement purposes they served, could be constitutionally justified on a level of suspicion falling short of probable cause. *See Acosta*, 157 F.3d *at 14 (*citing *Dunaway*, 442 U.S. at 209; Terry, 392 U.S. at 27).

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 13 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                         Page 13
Crim. No. 22-536 (FAB)

With the passage of time, the *Terry* doctrine has proven to be quite malleable, benefiting from a broad range of applications. In its modern adaptation, the doctrine provides that "based merely on a reasonable and articulable suspicion, a police officer may make a brief stop or 'seizure' of an individual to investigate suspected *past* or present criminal activity." *Acosta*, at 14 (quoting *United States v. McCarthy*, 77 F.3d 522, 529 (1st Cir. 1996), cert. denied, 519 U.S. 1093 (1997)) (emphasis added). Such a seizure will be upheld as constitutionally permissible so long as it was "justified at its inception, and, if so, . . . the action taken was reasonably related in scope to the circumstances which justified the interference." *Acosta, at 14* (quoting *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997)).

The oversight of brief investigatory stops has two aspects. First, a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity in order to make the initial stop. *United States v. Ruidíaz*, 529 F.3d 25, 28 (2008) (citing *Terry*, 392 U.S. at 21); see also *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001). Second, actions undertaken pursuant to that stop must be reasonably related in scope to the stop itself "unless the police have a basis for expanding their investigation." *Ruidíaz*, at 29 (quoting *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006)).

Reasonableness in this context is a construct that must be judged according to objective criteria; it is not dependent on an individual officer's subjective motives. *See Id.* (citing *Terry*, 392 U.S. at 21–22); *see also Whren v. United States*, 517 U.S. 806, 813 (1996). Not surprisingly, then, an inquiry into reasonableness requires a reviewing court to consider the totality of the surrounding circumstances. *Id.* (citing *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004)). This inquiry is fact-sensitive, and the requisite objective analysis must be performed in real-world terms. In other words, reasonableness requires a practical, commonsense determination, *see United States v. Sowers*, 136 F.3d 24, 28 (1st Cir. 1998)—a determination that entails a measurable degree of deference to the perceptions of experienced law enforcement officers. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *see also Chhien*, 266 F.3d at 8.

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 14 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                    Page 14
Crim. No. 22-536 (FAB)

The suspicion required to justify an investigatory stop may be rooted in a variety of permissible scenarios, including reasonable inferences that may be drawn when that information is viewed in light of the attendant circumstances. *Ruidíaz*, at 29. Isolated or minimal instances of innocent activity are insufficient to constitute reasonable suspicion, but several apparently innocent activities taken together may meet the required standard. *United States v. Sokolow*, 490 U.S. 1, 3, 9 (1989) (reasonable suspicion to stop because defendant matched six characteristics common to drug couriers, which considered together were inconsistent with innocent travel); *Terry*, 392 U.S. at 22 (explaining that each act may be "perhaps innocent in itself," but taken together, the acts "warranted further investigation"); *United States v. Tanguay*, 98 F.3d 1, 2-3, 5 (1st Cir. 2019) (reasonable suspicion to stop when officer observed vehicle parked for 20 minutes late at night and defendant claimed no ownership and was unable to produce driver's license.); *United States v. Dion*, 859 F.3d 114, 125 (1st Cir. 2017); *Ruidíaz*, 529 F.3d at 30 ("a fact that is innocuous in itself may in combination with other innocuous facts take on added significance.").

While no perfectly precise definition of reasonable suspicion exists, it is well established that, in terms of the continuum of knowledge, reasonable suspicion requires more than a mere hunch but less than probable cause. *Sokolow*, 490 U.S. at 7; *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004). It follows, therefore, that no direct link between the suspect and the suspected criminal activity need be forged in order to achieve reasonable suspicion. *Chhien*, 266 F.3d at 6.

A *Terry* stop is also not a snapshot of events frozen in time and place. Often, such a stop can entail an ongoing process. For that reason, "[t]he propriety of an officer's actions after an initial stop depends on what the officer knows (or has reason to believe) and how events unfold." *Romain*, 393 F.3d at 71. This means that if an officer undertakes an investigation pursuant to a *Terry* stop, his ensuing actions can be reasonable in response to the emerging tableau. *Chhien*, 266 F.3d at 6. As the investigation proceeds, the officer "may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 15 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                  Page 15
Crim. No. 22-536 (FAB)

detention." *Id*. S*ee also Sowers*, 136 F.3d at 27 (suggesting that "the actions undertaken by the officer following the stop [must be] reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop."). In determining whether reasonable suspicion exists, "a trained officer draws inferences and makes deductions . . . that might well elude an untrained person." *United States v. Cortéz*, 449 U.S. 411, 418 (1981).

### 2. *Probable cause standard*

If in the process of detaining an individual based on reasonable suspicion of suspected past or present criminal activity, law enforcement develops additional evidence that results in an arrest, that arrest will not contravene the Fourth Amendment's prohibition on unreasonable seizures so long as the arrest is supported by probable cause. *United States v. McFarlane*, 491 F.3d 53 (2007) (citing *United States v. Fiasconaro*, 315 F.3d 28, 35 (1st Cir. 2002)). "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect committed or was committing a crime." *United States v. Burhoe*, 409 F.3d 5, 10 (1st Cir. 2005). The inquiry into probable cause to support an arrest focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. *See United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005).

### 3. *The development of reasonable articulable suspicion to interact with the occupants of the gray Hyundai Accent ripened into probable cause for the defendant's arrest after finding the firearm at the defendant's feet on the floor of the Hyundai Accent*

The Court finds the testimony from Officers Zayas and Osorio about how and why they decided to stop and investigate the Hyundai Sonata parked in a vacant lot along Road 9929 on October 24, 2022 to be credible. As both officers consistently explained, Officer Osorio assigned Officer Zayas to investigate a carjacking that had occurred only three days prior in Humacao, Puerto Rico, at a gas station about 30 minutes away from where the Hyundai Sonata was spotted in San Lorenzo.

As fully acknowledged by the defendant in his post-hearing brief at page 1, "the only lead [in the carjacking investigation] was the motor vehicle used," a gray Hyundai Sonata. *See* Docket No. 64 at 1 (citing Docket No. 50 at 96). For that reason, it is reasonably plausible to believe that three days later Officers Zayas and Osorio would backtrack to the vacant lot to investigate a gray Hyundai Sonata. It is also reasonable that upon pulling behind the Hyundai Sonata on October 24, 2022, Officer Zayas would have recognized the license plate number of the vehicle that was depicted in the still photo for the carjacking that had been provided during his investigation. Officers Zayas and Osorio had ample articulable suspicion to approach and investigate the Hyundai Sonata. These suspicions were further buttressed by the finding that the license plate had been altered with black tape. No legitimate reason can be presented to justify such a blatant attempt to curtail the proper identification of a motor vehicle on our roads.

The now ample reasonable suspicion to intervene with the Hyundai Sonata was transferred to the Hyundai Accent that had been parked parallel to the Sonata, approximately 2 feet away, in what was otherwise a vacant, unpaved lot alongside the road. The close proximity between these two heavily tinted vehicles reasonably insinuated a relationship between them. The officers were already investigating the Hyundai Sonata for its suspected involvement with past criminal activity, the carjacking. Thus, when the heavily tinted vehicle right next to the Hyundai Sonata made an abrupt movement forward, the officers were justified in detaining the Hyundai Accent for investigation. After all, it is not uncommon for criminals to dump vehicles they have used in carjackings on isolated roads in an attempt to distance themselves from an investigation. Therefore, under these circumstances, any reasonable police officer would have been justified in stopping the Hyundai Accent and approaching its driver for investigation.

The Court also finds it objectively reasonable for Officers Osorio and Zayas to have exited their vehicle with weapons drawn once they determined that the Hyundai Accent was occupied and that it might reasonably be linked to the Hyundai Sonata. These officers had approached the vehicle in relation to the

carjacking in which it was alleged that several masked individuals had brandished long weapons to perpetrate the crime. Given the heavy tinting of the Hyundai Accent, so heavy that on a bright sunny day the officers had been unable to perceive whether or how many individuals were inside, safety dictated that the officers approach with weapons drawn.

The reasonable articulable suspicion that supported the officers initial approach of the Hyundai Accent quickly ripened into probable cause for an arrest. The emerging facts and the conduct of the driver and passenger increased the level of suspicion and justified the resulting arrest. That the driver surprised Officer Zayas by opening his door and addressing him as "colleague" was the type of appeasement or attempt at distraction that would peak an experienced officer's suspicions. Furthermore, that the defendant then opened the passenger-side door and admitted that he did not have a firearms license despite having a loaded firearm on the floor at his feet created the probable cause for an arrest. Any experienced police officer would have proceeded with those arrests without further ado. And, in doing so, he would have been acting within the strictures of the Constitution.

4. *Credibility is adjudicated based on an evaluation of the totality of the record*

Defendant challenges the credibility of Officers Zayas and Osorio by asserting that it would have been physically impossible for the officers to see the firearm in plain view. The defendant highlights the heavy tinting of the Hyundai Accent's windows as a factor in that argument. Defendant's argument misses the mark.

As explained above, the Court finds the officers' explanation of how and why they intervened with the Hyundai Accent to be credible. The officers' demeanor on the stand and the consistencies between their testimonies lend credibility to their explanations.

Furthermore, as shown in the photograph presented by the defendant on the bottom of page 6 of his Motion to Suppress, *see* docket no. 25, once the Hyundai

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 18 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                          Page 18
Crim. No. 22-536 (FAB)

Accent's doors were opened on a bright sunny day, the capacity to see its interior was unaffected by the window tinting. In addition, the firearm discovered in the vehicle, depicted in government's Exhibit 5, had a transparent high-capacity magazine and gold-colored bullets that would have been readily visible to a police officer trained to make "inferences [and] deductions . . . that might well elude an untrained person." *United States v. Cortéz*, 449 U.S. 411, 418 (1981). The Court finds the officers' testimony to that effect reliable and supported by the full record developed during the hearing.

The defendant also attempts to discredit Officer Zayas' testimony through his own interpretation of the audio recording between Officer Zayas and the PRPB dispatcher. The defendant characterizes Officer Zayas' response to the disclosure by dispatch that the license plate number HQO-995 was for a blue Hyundai Elantra as surprise to support a claim that Officer Zayas must have been lying when he testified that he noticed the black tape altering the Hyundai Sonata's license plate. The Court does not share the same impression. The Court finds, to the contrary, that the audio recording evidences Officer Zayas' compliance with the police procedure, using dispatch information to confirm that the altered number was assigned to a vehicle other than the Hyundai Sonata he was searching for in his investigation. This is why Officer Zayas also provided to the dispatch officer the Hyundai Sonata's VIN, information through which he was able to confirm that the altered license plate was a blatant attempt to conceal the identity of the vehicle that had been used in the carjacking.

In sum, the defendant's attempts to impeach Officer Zayas and Officer Osorio's testimony ring hollow.

**C. The Court's finding that Officers Zayas and Osorio had reasonable suspicion to detain the Hyundai Accent, which then ripened into probable cause to arrest the defendant, necessarily means that the defendant's incriminating statements are not the fruit of the poisonous tree**

The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's

general deterrent effect. *Ariz. v. Evans*, 514 U.S. 1, 10 (1995) *cf. Utah v. Strieff*, 57 U.S. 232, 241 (2016) (exclusion favored "only when the police misconduct is most in need of deterrence"). Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment generally must be excluded from evidence in the government's case-in-chief at trial. The exclusionary rule operates to exclude all evidence derived from the officers' illegality—so-called "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 485, 487-88 (1963). Suppressible evidence includes statements, observations, and physical evidence. *Miranda v. Ariz.*, 384 U.S. 436, 444-45 (1966). The purpose of the exclusionary rule is to deter police misconduct. *Strieff* 579 U.S. at 241. "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citation omitted) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

In this case, the Court has determined that Officers Zayas and Osorio had reasonable suspicion to detain the Hyundai Accent. Then, after discovering the firearm and ammunition on the passenger-side floor of the vehicle, the reasonable suspicion matured into probable cause to arrest after the defendant indicated that he did not possess a firearms license. As such, there is no police misconduct to deter and thus the fruit of the poisonous tree doctrine is inapplicable.

### D. The defendant's attack on the voluntariness of his post arrest statements, raised for the first time in his post-hearing brief, is not properly presented before the Court

In his Motion to Suppress, where the defendant requested an evidentiary hearing regarding the issues raised, he set forth the grounds upon which he claimed that the physical evidence seized, and the incriminating statements given, should be suppressed. *See* Docket No. 25. He argued exclusively that they were obtained as a result of police misconduct during the *Terry* stop and arrest and, therefore, they should be suppressed as "fruit of the poisonous tree." *Id.* at 8.

In his post-hearing brief, however, the defendant raised for the first time the argument that "[t]he government failed to meet its burden to demonstrate that the post-arrest statements made by [the defendant] on October 24, 2022, were knowing, voluntary and [made] after . . . a valid waiver of his *Miranda* rights." Docket 64, at 7. More specifically, the defendant stated that,

> [n]o testimony or other evidence was presented of the *Miranda* rights that were provided to Mr. De Jesús at any point in time. None of the witnesses indicated what were these *Miranda* rights, or whether Mr. De Jesus understood them and made an effective waiver prior to providing any statements. No waiver form was presented in court. The witnesses presented did not testify as to when did Mr. De Jesus waive his rights prior to making any statements, or how.

*Id.*

This statement misconstrues the record. In response to the question from the prosecutor, "Do you know whether the *Miranda* warnings were conveyed orally, in writing or in any other method?" Officer Cruz responded by saying, "Both." *See* Docket No. 50, at 17. The only evidence presented at the hearing regarding *Miranda* warnings was this uncontested statement that the defendant was duly advised of his rights.

Defendant's allegation is also a completely new and unrelated ground for suppression than those raised in the Motion to Suppress. Nowhere in the Motion to Suppress did the defendant allege that his incriminating statements were involuntarily given nor that they were the result of an unmirandized interrogation. He, once again, failed to swear out an affidavit, submit an unsworn statement under penalty of perjury, or testify during the hearing in support of any such violation of his constitutional rights. Defendant also failed to provide a reason for why such argument, if a valid concern, was not timely raised in the Motion to Suppress or prior to the scheduled hearing.

The failure to timely raise it means that the government was not afforded an opportunity to respond to the allegation and had no reason to present additional

Case 3:22-cr-00536-FAB    Document 67    Filed 09/24/24    Page 21 of 21

*United States v. Yadiel Omar De Jesus De Jesus*                                    Page 21
Crim. No. 22-536 (FAB)

evidence regarding the voluntariness of defendant's statements at the hearing. If the Court were to consider this argument now, without allowing the government to respond, it would be acting against the principles of judicial fairness and due process. The defendant cannot flagrantly disregard clear procedural rules and seek to profit from his disregard. *See e.g. United States v. Santana Cabrera*, 2010 WL 11695094, at *4 (D.P.R. Aug. 16, 2010) (district court adopted report of the magistrate judge that did not consider a defendant's theory for suppression brought untimely and previously adjudicated by the court).

In his post-hearing brief, the defendant is taking a record developed to address the arguments raised in the Motion to Suppress and cherry-picking the failure to present irrelevant evidence to argue that the government has not met its burden to rebut issues not properly presented before the Court. The Court cannot and will not condone such a misleading strategy.

## IV.    Conclusion

For the reasons discussed above, the Court **RECOMMENDS** that the Defendant's Motion to Suppress (Docket No. 25) be **DENIED**.

**IT IS SO RECOMMENDED.**

The parties have fourteen days to file any objections to this Report and Recommendation. Failure to file the same within the specified time waives the right to appeal this Report and Recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 24th day of September 2024.


*s/Marshal D. Morgan*
MARSHAL D. MORGAN
UNITED STATES MAGISTRATE JUDGE